# United States Court of Appeals
## For the First Circuit

No. 25-1063

NORTH END CHAMBER OF COMMERCE, INC.; 119 SALEM ST., INC., d/b/a
Ristorante Euno; ANTICO FORNO, INC., d/b/a Antico Forno; AQUA
PAZZA, INC., d/b/a Aqua Pazza; ASSAGGIO, INC., d/b/a Assaggio;
DOLCE, INC., d/b/a Dolce; FULL COMP, INC., d/b/a Mare Oyster
Bar; IL PANINO EXPRESS, INC., d/b/a Quattro Ristorante; IL
PANINO, INC., d/b/a Trattoria Il Panino [Parmenter St.];
MARNICO, INC., d/b/a Nico Ristorante; MONICA'S TRATTORIA ON
PRINCE, INC., d/b/a Monica's Trattoria; MONICA'S, INC., d/b/a
Vinoteca Di Monica, d/b/a Monica's Restaurant; NICOMAR, INC.,
d/b/a Strega; SCHIAFFO, INC., d/b/a Carmelina's; STREGA PIZZERIA
& CAFE CORP., d/b/a Rina's; TERRAMIA, INC., d/b/a Terramia
Ristorante; TRATTORIA IL PANINO HANOVER, INC., d/b/a Trattoria
Il Panino [Hanover St.]; TRESCA RESTAURANT GROUP, LLC, d/b/a
Tresca; UMBRIA NORTH END, INC., d/b/a Umbria; VADO PAZZO, INC.,
d/b/a Bricco Ristorante & Enoteca; VILLA FRANCESCA'S, INC.,
d/b/a Ristorante Villa Francesca,

Plaintiffs, Appellants,

CASARECCE LLC, d/b/a Casarecce Restaurant,

Plaintiff,

v.

CITY OF BOSTON,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

                         Before

                 Barron, Chief Judge,
           Howard and Kayatta, Circuit Judges.

                 _____

     Kieran G. Altieri, with whom Altieri Law & Consulting, PLLC
was on brief, for appellants.
     Samantha H. Fuchs, with whom Randall F. Maas, Samuel B.
Dinning, and City of Boston Law Department were on brief, for
appellee.

                 _____

                   July 30, 2026

                 _____

**KAYATTA**, **Circuit Judge**. This appeal arises from the City of Boston's (the "City") outdoor dining program during and after the COVID-19 public health emergency. After allowing outdoor dining in all neighborhoods in 2020 and 2021, the City began restricting outdoor dining in the North End, a historically Italian neighborhood that is home to the densest concentration of restaurants in the City. Plaintiffs[1] -- twenty-one North End restaurants and the North End Chamber of Commerce -- cried foul, claiming, among other things, that the City had violated their equal protection and due process rights under the U.S. Constitution. The district court dismissed plaintiffs' 202-page complaint for failure to comply with Rule 8 of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 8(a)(2). The court also declined to grant plaintiffs leave to amend, in part because it found their claims did not survive on the merits. For the reasons that follow, we affirm the dismissal of counts I-V without leave to amend. However, we vacate the dismissal of count VI, which alleges that a tax imposed by the City violated state law, and remand with instructions to dismiss this count without prejudice.

---

[1] One plaintiff, Casarecce LLC, did not join as an appellant, but for brevity we refer to plaintiffs-appellants as simply "plaintiffs" in this opinion.

## I.

"As this case comes to us on a motion to dismiss, we accept the factual allegations set forth in the amended complaint and disregard any conclusory allegations." State Tchrs. Ret. Sys. of Ohio v. Charles River Lab'ys Int'l, Inc., 152 F.4th 1, 4-5 (1st Cir. 2025) (citation modified).  "We also consider documents incorporated into the complaint by reference." Id. at 5 (citation modified).

### A.

In June 2020, in response to the COVID-19 public health emergency, Massachusetts Governor Charles D. Baker issued an executive order that allowed municipalities to grant restaurants licenses for outdoor table service subject to an abbreviated licensing process.  Consistent with this and subsequent orders, the City operated a temporary outdoor dining program in 2020 and 2021.[2]  In 2020, the program's rules were the same for all neighborhoods.  In 2021, the City delayed the start date of the program in the North End from late March to April 1 to allow the City's Licensing Board to finalize a plan for that neighborhood,

---

[2]  In 2021, the Massachusetts state legislature enacted an emergency law that similarly authorized outdoor dining. 2021 Mass. Acts ch. 20, § 19.  In 2022 and 2023, the legislature enacted additional emergency laws that extended the authorization of outdoor dining.  2022 Mass. Acts ch. 42, § 27; 2023 Mass. Acts ch. 2, § 38.

but the rules of the program were otherwise the same for all neighborhoods.

While many restaurants and residents supported outdoor dining, the implementation of the program also sparked complaints about issues including parking, traffic, noise, trash, and rodents. In the North End, the primary source of complaints was the North End/Waterfront Residents Association (NEWRA), a voluntary association of residents of the North End and an adjacent section of the Boston Waterfront that had long lobbied City officials to address quality-of-life issues in the neighborhood.

In response to NEWRA's complaints, the City formed a committee -- composed of NEWRA representatives, North End residents, and restaurant owners -- to advise on the future of outdoor dining in the North End. After two committee meetings, the City ended outdoor dining in the North End a month earlier than previously planned to facilitate planned construction and ease parking and traffic problems.

## B.

In November 2021, Michelle Wu became Mayor of Boston, and her administration began preparing the City's 2022 outdoor dining program. As part of these preparations, the Wu administration developed a North End-specific plan (the "2022 Plan"), which required North End restaurants participating in outdoor dining to pay a one-time $7,500 impact fee to mitigate the

effects of outdoor dining in the North End and a $480 monthly fee for each parking space used for an outdoor patio. The 2022 Plan also shortened the North End outdoor dining season to five months versus the eight-to-nine-month-long season in other neighborhoods. The City allegedly developed the 2022 Plan with little public input.

In late February 2022, the City announced that outdoor dining would begin on April 1 in every neighborhood except the North End. However, the City did not then reveal the details of the 2022 Plan, despite having allegedly already finalized that Plan. Instead, the City stated that it was "undergoing a community review" of outdoor dining in the North End to address the "special considerations [that] are needed due to the density of the restaurants in the neighborhood." During this review, the City received comments both in favor of and opposed to outdoor dining.

On March 18, 2022, the City announced the details of the 2022 Plan. At the meeting announcing that Plan, many North End restaurant owners vocally opposed it, and some suggested suing the City. Two days later, in an internal email, a City official posed a question: "If they sue, can we just say 'fine, we are shutting down the North End program'[?]"

The next day, at a Saint Patrick's Day gathering, Mayor Wu stated that she was "getting used to dealing with problems that are expensive, disruptive and white." While Mayor Wu said her

comment referred to "snowflakes" and "snowstorms," plaintiffs viewed it as a racially- or ethnically-biased comment aimed at them as white Italians.

On March 24, 2022, some North End residents and a restaurant owner started a petition to oppose the fees proposed in the 2022 Plan. The next day, Mayor Wu sent a letter to North End restaurant owners, in which she wrote that "[m]any North End residents have called for ending outdoor dining altogether in the neighborhood" and she described the 2022 Plan as "an effort to try one last time to strike the right balance." She then noted: "If a critical mass of restaurant owners also believe this program is unworkable as proposed, then I am prepared to rescind North End outdoor dining before the start of this season." She also explained that the North End was being treated differently from other neighborhoods because of "the unique impacts of outdoor dining on the quality of residential life." In particular:

> This neighborhood is home to the densest concentration of restaurants anywhere in the state. Last summer, this community had more than three times the number of on-street restaurant patios than the next highest neighborhood, the greatest loss of parking spots, and more 311 and constituent service complaints related to noise, congestion, rodents, and street cleanliness from outdoor dining than anywhere else —— by far.

Several days later, Mayor Wu held a press conference to address the 2022 Plan. The City did not invite or permit entry of

certain North End restaurant owners who had opposed the 2022 Plan. During the press conference, Mayor Wu explained that "[e]quity doesn't mean equality all across the board." She acknowledged that there were "needs all across [the] City" concerning rodent control, clean streets, trash pickup, and pedestrian safety and that those issues predated the outdoor dining program.

On May 9, 2022, several North End restaurant owners filed a lawsuit against Mayor Wu in federal court, alleging, among other things, that the fees included in the 2022 Plan violated Massachusetts law as well as the owners' equal protection and due process rights under the U.S. Constitution. Complaint at 5, Mendoza v. Wu, No. 1:22-cv-10710, 2022 WL 10483629 (D. Mass. Oct. 18, 2022).[3] After two motions to dismiss and an amended complaint, complainants voluntarily dismissed the suit.

Despite the lawsuit, the 2022 outdoor dining program proceeded in the North End, with sixty-two North End restaurants participating. Most restaurants paid the fees outlined in the 2022 Plan, but some qualified for hardship waivers and paid reduced

---

[3] That lawsuit was originally brought by four restaurant owners in their individual capacities but was later amended to add the restaurants themselves as plaintiffs. Compare Complaint at 1, Mendoza, 2022 WL 10483629 (No. 1:22-cv-10710), with Amended Complaint at 2-3, Mendoza, 2022 WL 10483629 (No. 1:22-cv-10710). Three of the four restaurant plaintiffs in the Mendoza action are plaintiffs in the current suit.

fees or paid prorated fees because they did not participate for the entire season.

The 2022 Plan originally included an end date in early September, but it allowed North End restaurants who received no "strikes" under the City's enforcement policy to extend their seasons until September 30. All participating North End restaurants qualified for this extended end date.

The City reported that it collected about $300,000 in impact fees from North End restaurants and spent almost $800,000 on the North End outdoor dining program during the 2022 outdoor dining season. However, the City attributed almost 70% of the total cost to the purchase of an electric street sweeper in August 2022. The street sweeper was programmed with specifications for North End streets and decorated with images from the North End and Italy, but it was used citywide.

Shortly after the North End's 2022 outdoor dining season ended, Mayor Wu announced that the City would celebrate October 10 as Indigenous Peoples' Day, not Columbus Day.

## C.

After the end of the 2022 outdoor dining season, NEWRA continued to campaign against outdoor dining in the North End. Members of NEWRA communicated extensively with City officials as the City prepared its plan for the 2023 outdoor dining season. In

contrast, the City communicated little with North End restaurant owners or non-NEWRA residents.

In February 2023, NEWRA prevailed:  The City announced that it would ban on-street dining in the North End in 2023 (the "2023 Ban"), although on-street dining would continue in all other neighborhoods.[4]  The City provided several reasons for the 2023 Ban, including anticipated traffic from major construction projects, the density of restaurants in the neighborhood, and related quality-of-life concerns such as issues with traffic, sanitation, and accessibility.

In its press release announcing the 2023 Ban, the City also announced the creation of a task force of North End residents and business owners (the "Task Force") to consider how to remedy for future years the problems the City had identified with on-street dining in the North End.  Through an online application process, the City assembled six residents and five business owners to serve on the Task Force.  Two of the residents selected were known opponents of outdoor dining in the North End.  The City controlled the Task Force meetings, which were not open to the public.  Over the course of seven months, the Task Force met for five total hours; during those meetings, the two opponents of

---

[4]  The 2023 Ban only extended to on-street dining, not to all outdoor dining.  The City continued to issue permits for compliant sidewalk patios.

- 10 -

outdoor dining were unwilling to compromise. After the Task Force's final meeting in October 2023, the City did not ask for written recommendations and did not contact the Task Force for almost three months.

On January 4, 2024, plaintiffs filed their first complaint in this action, challenging the 2022 Plan and the 2023 Ban. Several weeks later, the City called a virtual meeting of the Task Force, after which a City official circulated a draft summary of the Task Force's findings to the Task Force. The draft summary concluded that "it was clear that the Task Force could not meet a consensus as to what a North End specific on-street outdoor dining program could look like for the upcoming season." Six of the eleven members of the Task Force[5] objected to the draft summary and prepared an alternative summary, recommending specific interventions to address the City's purported issues with on-street dining in the North End.

On February 5, 2024, the same night City officials received this alternative summary, the City announced that

---

[5] The six members included four North End business owners and two North End residents, although one member listed as a resident in the alternative summary is listed as the owner of three North End restaurants in the City's draft summary. The five Task Force members who did not sign on to the alternative summary were all North End residents, not restaurant owners.

on-street dining would again be banned in the North End in 2024 (the "2024 Ban").[6]

After the 2024 Ban was announced, plaintiffs amended their complaint in this action to include allegations about the 2024 Ban. The operative complaint raised six challenges to the 2022 Plan, 2023 Ban, and 2024 Ban (collectively, the "outdoor dining policies"), arguing that: (1) the City violated plaintiffs' equal protection rights by treating North End restaurants differently from similarly situated restaurants in other neighborhoods; (2) the City violated the plaintiffs' equal protection rights by targeting "a white ethnic group" and "businesses having Italian ethnicity and/or Italian national origin"; (3) the City violated the plaintiffs' procedural due process rights; (4) the City violated plaintiffs' substantive due process rights; (5) the City's outdoor dining policies were arbitrary, capricious, and contrary to law; and (6) the fees imposed in the 2022 Plan constituted an unlawful tax.

The City moved to dismiss plaintiffs' complaint for failure to state a claim or, alternatively, for violation of Rule 8 of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 8(a)(2). Several days before the hearing on the motion to dismiss, plaintiffs requested a two-week continuance after the

---

    [6] As in 2023, the City only banned on-street dining and continued to issue permits for compliant sidewalk patios.

City produced approximately 28,000 pages in response to a public records request. The district court denied the motion for a continuance and subsequently allowed the City's motion to dismiss on Rule 8 grounds. The court dismissed plaintiffs' complaint without leave to amend, in part based on the court's determination that, independent of the Rule 8 violation, the complaint also failed to state a claim.

## II.

As the district court did, we begin with the City's motion to dismiss under Rule 8. We review for abuse of discretion. Kuehl v. F.D.I.C., 8 F.3d 905, 908 (1st Cir. 1993).

Under Rule 8, a complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The "plain" requirement ensures that the responding party receives fair notice of the plaintiff's claims, while the "short" requirement protects the court and the responding party from the "unjustified burden" of "select[ing] the relevant material from a mass of verbiage." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (quoting 5 Wright & Miller's Federal Practice & Procedure § 1281 (1st ed. 1969)). When we evaluate a complaint under Rule 8, we consider factors such as the length, clarity, and redundancy of the complaint; the burden that responding to the complaint imposes on the defendant and the court; whether the plaintiff was represented

by counsel; and whether plaintiff took advantage of opportunities to remedy any deficiencies in the complaint. See, e.g., Kuehl, 8 F.3d at 906-08 (affirming Rule 8 dismissal of an amended complaint that was "excessively long and unnecessarily redundant" after plaintiffs failed to heed a court order to conform with Rule 8(a)); Riddick v. Bos. Hous. Auth., No. 22-1557, 2023 WL 7806973, at *1 (1st Cir. June 20, 2023) (affirming Rule 8 dismissal of "rambling, repetitious, and disorganized" pro se complaint notwithstanding general rule that pro se complaints are held to less stringent standards than those prepared by attorneys because "it would have been unreasonable to expect Defendants-Appellees to frame a response to the Amended Complaint").

The district court held that plaintiffs' operative complaint violated Rule 8. In its decision, the court pointed to the complaint's sheer length (over 700 paragraphs and 200 pages), the inclusion of repetitive and extraneous details, and the resulting burden placed on both the City and the court in responding. We see no abuse of discretion in this holding. Indeed, we have affirmed Rule 8 dismissals of far shorter complaints. See Kuehl, 8 F.3d at 906 (43-page, 358-paragraph complaint); Brief for the Defendants-Appellees at 4, Riddick, 2023 WL 7806973 (No. 22-1557) (135-page, 644-paragraph complaint); Brief of Appellants at 16, Von Smith v. Al Thani, No. 20-2151, 2022 WL 2092505 (1st Cir. Feb. 14, 2022) (97-page, 731-paragraph

- 14 -

complaint); see also Von Smith, 2022 WL 2092505, at *1 (affirming dismissal).  And we agree that the complaint is both repetitive and rife with irrelevant detail,[7] unjustly burdening both the City and the courts.

Plaintiffs' arguments to the contrary fall flat.

First, plaintiffs assert that their operative complaint does "contain" a short and plain statement: its 14-page, 51-paragraph introduction.  The rest of the complaint, they say, just elaborates on this short and plain statement.  Thus, in plaintiffs' view, their complaint comports with Rule 8's text, which merely requires a complaint to "contain" -- but not necessarily only contain -- "a short and plain statement."  Fed. R. Civ. P. 8(a)(2).  But this reading of Rule 8 would allow, for example, a litigant to file a thousand-page complaint as long as it included within those thousand pages some "short" and "plain" statement -- even though the responding party and the court would be faced with the same burden of "select[ing] the relevant material

_____

[7] For example, the complaint discusses the City's purchase of an electric street sweeper at least five separate times.  This includes a nine-page timeline describing in exhaustive detail the street sweeper's purchase and use, two in-text photographs of the street sweeper, and three exhibits containing yet more photos.

The complaint also describes an "iconic" 1969 television commercial for the Prince Spaghetti Company, celebrates the North End restaurants' charitable endeavors during the pandemic, and includes multi-paragraph excerpts from articles criticizing the City's treatment of the North End.

- 15 -

from a mass of verbiage" that Rule 8 seeks to avoid. <u>Salahuddin</u>, 861 F.2d at 42 (citation omitted). In any event, even now, plaintiffs do not treat their introduction as sufficient: Their appellate briefing repeatedly refers to sections of the complaint outside the introduction to support their claims.

Second, plaintiffs argue that the purpose of Rule 8 is to give fair notice of the basis for the claims asserted in the pleading and that the City's motion to dismiss and the district court's opinion show that both the City and the court understood the basis of plaintiffs' claims. However, this argument again ignores that the purpose of Rule 8 is not only to ensure clarity but also to prevent undue burden. <u>Id.</u> And plaintiffs undercut their own argument in their appellate briefing by repeatedly criticizing the district court for failing to address purportedly key allegations in the complaint.

Finally, plaintiffs argue that their complaint was necessarily long because it covered several years of facts and included equal protection claims that must be plead in detail. While some pleadings are necessarily longer or more complex than others, 5 <u>Wright & Miller's Federal Practice & Procedure</u> § 1217 (4th ed. 2020), the number and type of claims raised in this case simply do not explain the length of plaintiffs' complaint. For example, plaintiffs attribute the length in part to the need to identify comparators for their class-of-one equal protection

claim, but plaintiffs do not even begin to identify comparators until page 127 of their complaint. They also argue that their "anti-Italian" discrimination claim requires them to plead specific historical elements, but they cover the history of Italians in the North End in a mere eight paragraphs, much of which is entirely unnecessary.

Plaintiffs ask that, if we affirm the district court's Rule 8 holding, we remand with instructions to grant leave to amend so that plaintiffs can file an amended complaint that complies with Rule 8. As the district court correctly observed, in the case of a Rule 8 violation, a court should normally dismiss without prejudice or with leave to amend. See Kuehl, 8 F.3d at 908. Here, though, the district court cited several reasons for deviating from this normal practice. The district court noted that plaintiffs (1) did not request leave to amend in their opposition to the motion to dismiss despite facing a Rule 8 challenge and (2) had already filed two previous complaints in this action as well as multiple complaints in the previous Mendoza action.[8] Finally, turning to the substance of plaintiffs' claims, the district court found the complaint wanting on the merits.

---

[8] The amendments in both this case and in the Mendoza case were not made in response to any Rule 8 issues raised by the district court or defendant.

Not fully comfortable with the district court's first two reasons for dismissing the complaint without leave to amend, we, like the district court, give plaintiffs the benefit of turning to the merits. After reviewing the merits, we agree that counts I-V do not survive, as we explain below. We thus affirm the dismissal of these claims without leave to amend. And because plaintiffs do not tender or even describe any proposed shorter complaint that would include new material bearing on our merits analysis, plaintiffs' request to amend to comply with Rule 8 is moot. After finding that plaintiffs' federal claims fail, we decline to reach the merits of count VI, plaintiffs' state law unlawful tax claim. We therefore vacate the dismissal of that claim and remand for the district court to dismiss count VI without prejudice.

## III.

### A.

We start with plaintiffs' federal claims, which we review de novo under the familiar Rule 12(b)(6) standard. Legal Sea Foods, LLC v. Strathmore Ins. Co., 36 F.4th 29, 33-34 (1st Cir. 2022).[9]

---

[9] "To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must provide a short and plain statement of the claim showing that the pleader is entitled to relief, with enough factual detail to make the asserted claim plausible on its face." Legal Sea Foods, 36 F.4th at 33 (citation modified). In reviewing whether a claim survives, "we accept as

- 18 -

**1.**

We turn first to plaintiffs' equal protection claims, detailed in counts I and II.

Plaintiffs contend that the City restricted outdoor dining in the North End because the North End restaurant owners are white.[10] Nothing on the face of the outdoor dining policies[11] or the City's deliberations and explanations so suggests. So, to cobble together this claim, plaintiffs point to a smattering of unrelated events, such as Mayor Wu's reference to "white" problems and her holding of an event open only to people of color.[12] But

---

true all well-pleaded facts in the complaint and draw all reasonable inferences therefrom in the plaintiff's favor," but we "credit neither conclusory legal allegations nor factual allegations that are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." Id. at 33-34 (citation modified).

[10] Plaintiffs are corporations and thus have no racial or ethnic identity themselves. See Des Vergnes v. Seekonk Water Dist., 601 F.2d 9, 13 (1st Cir. 1979). But because "[a] corporation ordinarily carries out its activities through its employees," "discrimination against [the corporation's] employees could amount to racial [or national origin] discrimination against [the corporation]." Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 14 (1st Cir. 1999).

[11] Below, plaintiffs argued that the outdoor dining policies were not facially neutral, but they develop no arguments regarding this facial discrimination theory on appeal, so we do not consider this argument. See United States v. Mayendía-Blanco, 905 F.3d 26, 32 (1st Cir. 2018) ("[I]t is a well-settled principle that arguments not raised by a party in its opening brief are waived.").

[12] Plaintiffs criticize the district court for not addressing their allegation that, beyond simply hosting an event for elected people of color, the City -- after mistakenly inviting some elected officials who were not people of color to that event -- rescinded

- 19 -

an equal protection claim requires evidence that the complainant was treated differently on account of a protected characteristic -- here, plaintiffs' race.  Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for Bos., 89 F.4th 46, 59 (1st Cir. 2023) ("[T]o successfully challenge the use of a facially neutral, and otherwise bona fide, selection criterion, [plaintiffs] must prove both improper intent and disparate impact.").  Yet not even the bloated complaint alleges or permits us to plausibly infer that those restaurant owners treated more favorably by the City's policies were not white or even that white people disproportionately own North End restaurants.  Indeed, for all we know from the complaint, all or most of those said to have been treated more favorably than plaintiffs were also white.

Trying again, plaintiffs contend that they were treated differently from other restaurants because their owners are Italian.  As evidence they point to the outdoor dining policies' disproportionate impact on restaurants in a historically Italian neighborhood as compared to restaurants in other neighborhoods. But the story alleged in the complaint is one in which the City favored the interests of one group in an internecine dispute within the historically Italian neighborhood over the interests of

those invitations, thereby "uninvit[ing] and exclud[ing] white electeds." But that act, already tangential at best to plaintiffs' claims, has no bearing here, where plaintiffs have failed to establish any disparate impact along racial lines.

another group within that same neighborhood.[13]  One could just as easily infer that the City favored the Italian neighbors in the North End who opposed on-street dining in their neighborhood over non-Italian neighbors in other parts of Boston who opposed on-street dining in their neighborhoods.  In any event, even if we assume that plaintiffs have alleged a disproportionate impact on Italians, such an impact by itself is insufficient to trigger strict scrutiny.  See Washington v. Davis, 426 U.S. 229, 242 (1976); Bos. Parent Coal., 89 F.4th at 59 (requiring "both improper intent and disparate impact" to invoke strict scrutiny of a facially neutral policy).

In search of improper intent, plaintiffs point to the City's decision to celebrate Indigenous Peoples' Day rather than Columbus Day.  But nothing about that decision suggests any ethnic animus unless we are to infer that every renamed holiday and every statue erected or removed is evidence of animus toward some group that is necessarily manifest in all other decisions that affect that group.  Cf. Conf. of Presidents of Major Italian Am. Orgs., Inc. v. City of Phila., No. 22-1116, 2023 WL 1069704, at *3 (3d Cir. Jan. 27, 2023) (holding that group of Italian Americans had

_____

[13]  Plaintiffs allege that NEWRA also included residents from the neighboring Boston Waterfront, which "has no particular ethnic identity," but they do not allege -- nor is it plausible to infer -- that members of NEWRA were only from the Waterfront nor that the North End residents who were members of NEWRA were not Italian American.

no standing to challenge city's decision to redesignate Columbus Day as Indigenous Peoples' Day in part because the court could not "say that [plaintiffs] have suffered 'invidious discrimination' when the city selectively celebrates particular ethnicities with designated holidays").[14]

Of course, if the City's decision lacked any rational basis, then plaintiffs' complaint might survive, either under their racial/ethnic discrimination theory or under a class-of-one equal protection theory. See Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos., 996 F.3d 37, 45 (1st Cir. 2021) (noting that, "[a]bsent a showing of discriminatory purpose," facially neutral government actions are reviewed "for a rational basis only"); Vill. of Willowbrook v. Olech, 528 U.S.

---

[14] Nor do plaintiffs present any evidence from which we can infer that the City harbored animus against them not just as white people or as Italians but as the specific combination of those identities. Therefore, to the extent plaintiffs claim the City treated them disparately because they are "white Italian Americans," that claim fails for the same reason as their claim of anti-Italian discrimination. Cf. Jefferies v. Harris Cnty. Cmty. Action Ass'n, 615 F.2d 1025, 1032 (5th Cir. 1980) (agreeing with plaintiff that, in the Title VII context, "an employer should not escape from liability for discrimination against black females by showing that it does not discriminate against blacks and it does not discriminate against females"); Lam v. Univ. of Haw., 40 F.3d 1551, 1562 (9th Cir. 1994) (agreeing with the Jefferies court that "when a plaintiff is claiming race and sex bias, it is necessary to determine whether the employer discriminates on the basis of that combination of factors, not just whether it discriminates against people of the same race or of the same sex" because "the attempt to bisect a person's identity at the intersection of race and gender often distorts or ignores the particular nature of their experiences").

562, 564 & n.* (2000) (describing the class-of-one theory, under which a single person, or a single group of persons, can prevail by showing that they have "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment"). But numerous rational reasons for the City's decisions jump off the pages of the complaint, most obviously the City's responsiveness to complaints from North End residents and the litany of more detailed explanations tendered by the City itself, such as concerns with traffic, parking, construction, noise, and rodents.[15] Addressing such quality-of-life issues is plainly a legitimate state interest. See Young v. Am. Mini Theatres, Inc., 427 U.S. 50, 71 (1976) (noting that a "city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect"). And while plaintiffs argue that other neighborhoods had similar problems, the complaint does not claim that those neighborhoods were also caught up in such a substantial and prolonged dispute between restaurant owners and residents about outdoor dining's

---

[15] Plaintiffs argue the district court erred by, in their view, accepting the City's explanations for its policies notwithstanding plaintiffs' allegation that those explanations were pretextual. But, on rational basis review, "a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," Heller v. Doe, 509 U.S. 312, 320 (1993) (citation modified), and here, the City's explanations provide just that.

- 23 -

exacerbation of those problems. In any event, "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." City of New Orleans v. Dukes, 427 U.S. 297, 305 (1976) (citation omitted).[16]

Trying another tack, plaintiffs suggest that the City closed down on-street dining in only the North End as retaliation against plaintiffs for filing suit against and otherwise protesting the 2022 Plan. In particular, they point to two March 2022 statements from City officials as suggesting retaliatory animus: (1) the internal email asking, "[i]f they sue, can we just say 'fine, we are shutting down the North End program'" and (2) Mayor Wu's letter to restaurant owners in which she said, "[i]f a critical mass of restaurant owners also believe this program is unworkable as proposed, then I am prepared to rescind North End outdoor dining before the start of this season."

But the chronology of events surrounding the outdoor dining policies belies any inference of retaliatory motive raised by these statements sufficient to withstand a motion to dismiss.

---

[16] Because we conclude that the outdoor dining policies survive rational basis review, we need not address plaintiffs' arguments regarding whether other neighborhoods or other restaurants are the appropriate "similarly situated" comparator for their class-of-one claim. See Olech, 528 U.S. at 564 (requiring a class-of-one equal protection plaintiff to "allege[] that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment" (emphasis added)).

- 24 -

Before any alleged retaliatory motive arose, the City had already begun treating the North End differently by delaying and shortening the 2021 season and then announcing the 2022 Plan. See Rubinovitz v. Rogato, 60 F.3d 906, 911 (1st Cir. 1995) (finding no inference of retaliation when challenged government action began before alleged motive to retaliate existed). Then, the City's eventual decision to ban on-street dining in the North End came eleven months after the purportedly retaliatory statements and nine months after several North End restaurants actually did sue. See Packish v. McMurtrie, 697 F.2d 23, 27 (1st Cir. 1983) (suggesting that fact that purportedly retaliatory action "came well over a year after publication of the letters against which it was allegedly in retaliation" weighed against a finding of retaliation). And in this nine-month interim, the City operated and then extended the 2022 outdoor dining season in the North End as previously announced and even offered hardship waivers to facilitate participation. Separate from this chronology, the context also undermines plaintiffs' theory of retaliation: Outdoor dining was "the subject of a political controversy in which all parties were engaged," which makes it "difficult to infer that defendant[] [was] motivated by dislike of plaintiffs' exercise of [their constitutional rights] rather than simply by disapproval

of" outdoor dining in the North End.  Cloutier v. Town of Epping, 714 F.2d 1184, 1192 (1st Cir. 1983).[17]

Aside from this alleged retaliatory motive, plaintiffs argue that the City's treatment of the North End was "based on improper animus."  While an equal protection claim can, under certain circumstances, be based on "malicious or bad faith intent to injure," McCoy v. Town of Pittsfield, 59 F.4th 497, 508 (1st Cir. 2023) (citation omitted), plaintiffs do not identify any improper motive apart from the insufficiently pled retaliatory or discriminatory animus already discussed.[18]

Accordingly, we find that plaintiffs have not plausibly alleged an equal protection claim.

_____

[17]  For similar reasons, the City's decision to invite some but not all North End restaurant owners to attend a press conference does not support an inference of retaliatory animus toward North End restaurants as a group.  Nor does the City's creation of the Task Force to address issues with outdoor dining in the North End support such an inference, even if, as plaintiffs allege, the City did not ultimately value the contributions made by that Task Force.

[18]  To the extent plaintiffs suggest that the fact that the North End was singled out creates an inference of bad faith or malicious intent to injure, "different treatment does not itself prove bad faith intent to injure." Yerardi's Moody St. Rest. & Lounge, Inc. v. Bd. of Selectmen, 932 F.2d 89, 92 (1st Cir. 1991). And plaintiffs' suggestion that the City's given justifications for the outdoor dining policies were pretextual does not provide "independent evidence of malice" because, given our conclusion that plaintiffs have failed to plausibly demonstrate retaliatory or discriminatory animus, plaintiffs' claim of pretext "merely casts doubt on the [City's] offered rationale without offering evidence of another explanation." Id. at 92-93 (emphasis omitted).

- 26 -

**2.**

We next turn to count III, plaintiffs' procedural due process claim.

"The threshold question in any claim for denial of procedural due process is whether a plaintiff was deprived of a liberty or property interest protected by the United States Constitution." Zell v. Ricci, 957 F.3d 1, 8 (1st Cir. 2020) (citation modified). Only after answering that question in the affirmative do we turn to the question of the process due. Id.

Plaintiffs stumble at the threshold. A protected property interest is a "legitimate claim of entitlement to the property in question -- a claim of entitlement created and defined by existing rules or understandings that stem from an independent source such as state law." Davis v. Coakley, 802 F.3d 128, 134 (1st Cir. 2015) (quoting Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 8 (1st Cir. 2005)). On appeal, plaintiffs advance three arguments as to why they had a protected property interest in outdoor dining licenses.[19] None succeed.

_____

[19] In a footnote, plaintiffs make perfunctory mention of two additional arguments: (1) that they had a property interest based on an "ethic that pervades our legal system" in matters "where government exerts power upon an individual in a matter of consequence," Yerardi's Moody St. Rest. & Lounge, Inc. v. Bd. of Selectmen, 473 N.E.2d 1154, 1159 (Mass. App. Ct. 1985), and (2) that they had a property interest in the goodwill of their businesses. We consider these arguments waived. See Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 60 n.17 (1st Cir. 1999)

First, plaintiffs argue that they had a protected property interest in outdoor dining licenses based on Massachusetts's emergency COVID legislation. That legislation provided that a municipality "may approve a request for expansion of outdoor table service" or "an extension of an earlier granted approval issued under [the governor's initial COVID-19 orders]" using the abbreviated process set forth in those earlier orders; "may modify the scope" of any such requested extension before approving it; and, "[b]efore . . . approval" of any request, "shall establish the process for approving such requests." 2021 Mass. Acts ch. 20, § 19(b), (d). "Any outdoor table service approved for expansion" or "extension" under this emergency legislation was to "automatically revert back to the status prior to the approval" on the statutory deadline of April 1, 2022. Id. § 19(e). Subsequent legislation extended that deadline, first to April 1, 2023, and then to April 1, 2024. 2022 Mass. Acts ch. 42, § 27; 2023 Mass. Acts ch. 2, § 38.

Plaintiffs argue that this language means that, once the City approved a restaurant to provide outdoor table service, that restaurant's outdoor dining license had to remain in effect until the extended statutory deadline of April 1, 2024, and could not be revoked before that date without due process. Thus, in plaintiffs'

("We have repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived.").

- 28 -

view, when the City decided not to allow on-street dining in the North End in the 2023 and 2024 seasons, that decision constituted an improper revocation of the licenses granted to plaintiffs in previous seasons which did allow on-street dining.

While the revocation of a vested license can constitute the deprivation of a constitutionally protected property interest, see González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011), plaintiffs misread the emergency legislation. The statutory deadline does not suggest that, once a license is granted, it automatically remains in effect until the deadline. Rather, it means that any license that is still in effect on the deadline will cease to be valid once that deadline passes. Nor does the statute require municipalities to issue licenses that last for as long as the statutory scheme survives or otherwise prohibit municipalities from granting licenses on a year-by-year basis, as the City chose to do. On the contrary, the statutory scheme confers considerable discretion upon municipalities, both in "establish[ing] the process" to manage applications and approvals and "modify[ing] the scope" of approvals issued under prior COVID-19 emergency orders. 2021 Mass. Acts ch. 20, § 19(b), (d). Indeed, the entire scheme is permissive: It states that municipalities "may" grant outdoor dining licenses and only mandates the creation of any licensing process at all if a municipality in fact chooses to do so -- and then leaves it to

municipalities to decide what that process entails. In short, nothing in this legislation created a legitimate claim of entitlement to an outdoor dining license that lasted beyond the season-long licenses the City chose to grant. Instead, prior to each outdoor dining season, plaintiffs were mere prospective licensees without a property interest in a license for the next season. See Harron v. Town of Franklin, 660 F.3d 531, 537 (1st Cir. 2011) (holding that a "would-be holder of a liquor license" "had no property interest in the license").[20]

Second, plaintiffs contend that the importance of the outdoor dining licenses to their businesses created a protected property interest. But, while "a purpose of the ancient institution of property" is "to protect those claims upon which people rely in their daily lives," "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972).

Third, plaintiffs say a property interest was created by a mutual understanding between the parties. A property interest can be created by "mutually explicit understandings that support [the plaintiff's] claim of entitlement to the benefit." Perry v.

---

[20] For the same reasons, we reject plaintiffs' argument that the City lacked authority under this statutory scheme to impose the 2023 and 2024 Bans.

Sindermann, 408 U.S. 593, 601 (1972). For example, "an explicit contractual provision" or "other agreements implied from the promisor's words and conduct" can create property rights. Id. at 601-02 (citation modified). However, plaintiffs have not plead facts plausibly suggesting such a mutually explicit understanding. Plaintiffs point to the notice the City circulated for the March 2022 meeting where the 2022 Plan was announced; the notice referred to restaurants planning to participate in the 2022 outdoor dining season as "[l]icensees" in a parenthetical shorthand. Even assuming one might infer from such language some sort of implied understanding that plaintiffs already held outdoor dining licenses for the upcoming season, this certainly falls far short of the "mutually explicit" understanding required. Plaintiffs then point to a December 2022 City presentation that stated that a goal for future outdoor dining seasons was to "retain as many restaurants from this year's program" and a February 2023 press release announcing that the Task Force would "determine how the[] issues [with outdoor dining] could be remedied in future iterations of the permanent outdoor dining program." But expressing hopes for future outdoor dining seasons is not a promise of a future license. Even considering these allegations together, nothing plausibly suggests a mutually explicit understanding between plaintiffs and the City.

Because plaintiffs fail to identify a protected property interest, their procedural due process claim necessarily fails.

**3.**

We turn next to count IV, plaintiffs' substantive due process claim. When analyzing a substantive due process challenge to legislative conduct such as the City's policies here, we "ask[] whether a fundamental right is involved and whether the government conduct restricts that fundamental right." Foote v. Ludlow Sch. Comm., 128 F.4th 336, 346 (1st Cir. 2025), cert. denied, 224 L. Ed. 2d 497 (2026); see also id. (describing statutes, regulations, and "governmental polic[ies] of any kind" as legislative conduct). If plaintiffs fail to allege that the relevant state conduct infringed upon a fundamental right, we review only for rational basis. Id. at 356.

Here, plaintiffs fail to identify a fundamental right affected by the City's outdoor dining policies. "Substantive due process protects only those interests that implicate one of 'those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" González-Fuentes v. Molina, 607 F.3d 864, 880 n.13 (1st Cir. 2010) (quoting Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997)). "As a result, the interests protected by substantive due process are of course much

narrower than those protected by procedural due process." Id. (citation modified). The only right plaintiffs have identified is a right to the outdoor dining licenses, and, as discussed above, plaintiffs have not adequately alleged that this is a protected property interest for the purposes of procedural due process, much less a fundamental right that implicates substantive due process. We note also that no fundamental "right to make a living" exists for substantive due process purposes. Mulero-Carrillo v. Román-Hernández, 790 F.3d 99, 107 (1st Cir. 2015) (citation modified).

Because plaintiffs have not identified any fundamental right impacted by the City's outdoor dining policies, our previous conclusion that those policies survive rational basis review means that this claim also fails.

**B.**

Having disposed of plaintiffs' federal claims, we progress to plaintiffs' state law claims, counts V and VI, which are only in federal court under supplemental jurisdiction. See 28 U.S.C. § 1367.[21] After dismissing plaintiffs' federal claims, the

---

[21] Plaintiffs frame each of these counts as violations of the federal Declaratory Judgment Act. See 28 U.S.C. §§ 2201-2202. But "[f]ederal jurisdiction does not lie simply because relief is requested under the federal Declaratory Judgment Act." Colonial Penn Grp. v. Colonial Deposit Co., 834 F.2d 229, 232 (1st Cir. 1987). The Declaratory Judgment Act is "procedural only"; it "merely expands the relief available through litigation" and "does not affect parties' substantive rights." Id. (citation omitted).

- 33 -

district court was "required to 'reassess its jurisdiction' by 'engaging in a pragmatic and case-specific evaluation of a variety of considerations'" such as "the interests of fairness, judicial economy, convenience, and comity." Miller v. Town of Wenham, 833 F.3d 46, 56 (1st Cir. 2016) (quoting Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998)). At early stages of litigation, "the balance of competing factors ordinarily will weigh strongly in favor of declining jurisdiction over the remaining state law claims." Id. (citation modified).

Plaintiffs' first state law claim -- that the City's outdoor dining policies were arbitrary, capricious, and contrary to law -- has been waived on appeal because they failed to address it in their opening brief.[22] See Álamo-Hornedo v. Puig, 745 F.3d 578, 582 (1st Cir. 2014) ("Black-letter law holds that, in the absence of exceptional circumstances, arguments presented for the first time in an appellant's reply brief are deemed waived.").

Here, plaintiffs cite no federal source of substantive rights for count V or VI. Plaintiffs point instead to Massachusetts state law as the source of substantive rights underlying count VI, and, while neither plaintiffs' complaint nor their briefing to this court identify any source of substantive rights at all as to count V, we credit their papers below, which point to Massachusetts state law, and construe this count as a state law claim as well.

[22] While plaintiffs point in their reply brief to some vague, indirect references to this claim in their opening brief, this is not enough to avoid waiver. See Rodríguez v. Mun. of San Juan, 659 F.3d 168, 175 (1st Cir. 2011) ("Judges are not mind-readers, so parties must spell out their issues clearly, highlighting the relevant facts and analyzing on-point authority.").

Vacating dismissal of this state law claim "would promote neither comity nor justice" given this clear waiver, since our disposition of this claim requires no "decision[] of state law" at all, let alone a "[n]eedless" one. Lambert v. Fiorentini, 949 F.3d 22, 29 (1st Cir. 2020) (citation omitted).

However, plaintiffs' other state claim -- that the 2022 Plan's impact fees were an unlawful tax under Massachusetts law -- turns on "questions of state law with which the state courts are more familiar." Miller, 833 F.3d at 56. Given this and the early stage of the litigation, the balance weighs against considering the merits of this claim. But since we do not consider the merits, we conclude a Rule 8 dismissal with prejudice is not appropriate. Accordingly, this claim should be dismissed without prejudice.

**IV.**

We end with plaintiffs' objection to the district court's denial of their motion to continue to allow two weeks to "more closely review" additional documents turned over by the City. Any such objection is waived because plaintiffs addressed it exclusively in footnotes in their opening brief and a cursory paragraph in their reply brief. See United States v. Zannino, 895 F.2d 1, 17 (1st. Cir. 1990); Álamo-Hornedo, 745 F.3d at 582. In any event, well more than two weeks long ago passed, and the

specific documents plaintiffs identify are not relevant to our conclusions in this appeal.[23]

**V.**

For the foregoing reasons, we <u>affirm</u> the district court's dismissal of counts I-V without leave to amend and its denial of plaintiffs' motion to continue. We <u>vacate</u> the district court's dismissal of count VI and <u>remand</u> with instructions to dismiss that claim without prejudice.

---

[23]  For example, plaintiffs flag documents that they allege suggest the City's concerns about traffic and density were pretextual.  But we rejected plaintiffs' pretext argument as legally -- not factually -- unavailing, so these documents do not change our conclusions.  <u>See</u> <u>supra</u> Section III.A.1.